IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

EDDIE S. WATKINS                                                                                      PLAINTIFF

v.                          Civil No.   6:10-cv-06092

JAILER LINDA ROWE, Hot Spring
County Detention Center (HSCDC); and D.
ELKIN, HSCDC, Nurse Practitioner                                                          DEFENDANTS

## MEMORANDUM OPINION

This is a civil rights case filed pursuant to the terms of 42 U.S.C. § 1983.  Plaintiff, Eddie Watkins, proceeds *pro se* and *in forma pauperis*.  The case is before me on the consent of the parties (Doc. 16).

Watkins is currently incarcerated in the Arkansas Department of Correction (ADC), Ouachita River Correctional Unit in Malvern, Arkansas.  The events that are the subject of this case occurred while he was incarcerated at the Hot Spring County Detention Center (HSCDC).  On motion for summary judgment the claims against certain Defendants were dismissed.  This left for later resolution Watkins' claim that Jailer Rowe and Nurse Practitioner Elkin, in their individual capacities, were deliberately indifferent to Watkins' serious medical needs.

A bench trial was held on December 11, 2012.  The record was left open following the hearing for the admission of additional medical documentation.  The Court has received Nurse Practitioner Elkin's records of his visits with Watkins.  These documents have been labeled Court's Exhibit 2.  The records of the Hot Spring County Medical Center have been labeled Court's Exhibit 3.  Watkins' ADC records have also been received and labeled Court's Exhibit 4.

At the trial, the Court heard the testimony of the following witnesses: (1) the Plaintiff, Eddie

Watkins; (2) Dr. Carlos Rivas (via telephone); (3) Sheriff Ryan Burris; (4) Richard Tollerson; (5) Marcus Hawkins; (6) Rodney Compton; (7) Linda Rowe; and (8) Darrell Elkin.  For purposes of discussion, the witness testimony will be summarized.

### 1.  Background

The period of incarceration at issue in this case began on August 24, 2010 and ended on January 18, 2011, when Watkins was transferred to the ADC.

### Eddie Watkins

In addition to the incarceration at issue in this case, Watkins testified he had been incarcerated in the HSCDC on a number of occasions.  In January 2010, Watkins maintains he was booked and because of his medical problems ordered released the same day by the Sheriff.  He testified that Rowe was aware of this situation because she was the one who released him.

In August of 2010, Watkins testified that he was on seizure, high blood pressure, diabetes, and pain medication.  There was a family history of seizure disorders and diabetes.  Watkins stated that when he informed Linda Rowe about his medical problems she "yelled" the medical conditions were pre-existing.  Additionally, the HSCDC's inmate insurance information form provides that all medical bills from a pre-existing medical condition are the responsibility of the inmate or his insurance carrier. *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) W.  As he had no insurance, Watkins was listed as the responsible person. *Id.*  With no insurance, Watkins testified that there were a "lot" of times when he was without medication.  I

With respect to Jailer Linda Rowe, Watkins testified that she just did not want the County to pay for his medication.  This is why he believed that she did not look at his old jail files.  Additionally, he points out that Rowe was the one who maintained she called a number of places to verify his medication.

Watkins testified that in August of 2010 and January of 2011 family members delivered medication to the jail. However, Watkins reported that he had never received the medication.

As further proof that Rowe was aware of his medical conditions, Watkins points to a letter Rowe wrote to the ADC Medical Department. *Plff's Ex.* X-1. In it, Rowe stated that "Dr. Elkin has issued a request for immediate transport due to medical." *Id.* Rowe indicated she had received a call from "Joyce in intake stating to send him on 01/18/11." *Id.*

On August 27, 2010, a list of medications from September of 2009 was provided by the Randall Williams Unit of the ADC. *Plff's Ex.* C-2 & R. Rowe wrote that the list would be provided to the doctor who would be at the detention center on August 30, 2010. *Plff's Ex.* C-2.

Plaintiff's Exhibit A is a medication list dated November 7, 2009. The list includes the following: Enalapril, a high blood pressure medication; Glyburide, a diabetes medication; Dilantin, a seizure medication; Tegretol, a seizure medication; Beclofen, used to decrease muscle spasms and to relieve pain; and a multi-vitamin. Plaintiff's Exhibit B at page three lists the medications Watkins was on in January of 2007. These records also indicate that Watkins had epilepsy, hypertension, back pain, and diabetes. *Plff's Ex.* B at pg. 2.

Watkins indicates he did not fill these medications at that time because when he was released from the ADC he was given "gate medication" of six months. He testified he still had a supply of the medication but had taken the last of it the day he was arrested and booked into the HSCDC. From January to July of 2010, Watkins maintained that he was taking old medication that his Mother had found. This medication lasted until he was booked into the HSCDC. Watkins believed that the last written prescription he had was in January of 2010. While at the ADC, Watkins states he was put on seizure medication.

Watkins stated that there were periods of time while he was in the "free world" that he was

without medication because he did not have the money to pay for them. When he did have medication, he tried to stretch it out by not taking it every day. While he had many seizures, Watkins testified that he did not have any from September of 2009 until September of 2010. Watkins stated that he did not take care of himself while in the free world.

While he was in the HSCDC, Watkins testified that his blood sugar level was never tested and he ate a "regular meal." Occasionally he would be provided with a snack in the evening. He testified that he could pretty much tell when his blood sugar level was out of control.

Watkins maintains the Defendants could have easily checked the records from his prior incarcerations to determine what medications he was on or simply taken him to be evaluated. With respect to his family bringing his medication, Watkins testified that his Mother did not ordinarily go into his room and she could not locate the medications. Watkins asserts that he even said he would pay for the medication. Watkins reported that he had been on medications for fifteen or twenty years.

Watkins testified he made repeated efforts to obtain his medications. The day he was booked in, Watkins filed a grievance stating he needed seizure, blood pressure, diabetes, and pain medication for his back. *Plff's Ex.* C-1. Other grievances were submitted on August 28th, August 29th, September 6th, September 11th, October 7th, October 8th, and November 1st in which he asserted that he was not being provided his medication. *Plff's Ex.* C-2 to C-10. On at least one occasion he informed them that he was having seizures and coughing up blood. *Id.* at C-7. In all, Watkins estimated that he had suffered twenty mild seizures. As a result of falling during one seizure, he testified that he had scarring on his left upper lip, his mid-upper lip, a scar on his forehead, and a

permanent knot on his forehead as a result of the seizures. *Plff's Ex.* Q-1.[1] The day he fell, Watkins testified he had not been feeling well and doesn't remember much about the fall. He said he was standing up talking and the next he knew he was on the floor.

Watkins points out that the jail medication ledgers for him do not start until October 19th. *Plff's Ex.* T-2 to T-10. Even then, there is no indication he was given any medication other than Ibuprofen until November 1st when Watkins also began receiving methylprednisolone, a corticosteroid. *Id.* None of the medication logs indicate Watkins received any medications for epilepsy, diabetes, or high blood pressure. *Id.*

Watkins testified that he saw Elkin five or six times during his incarceration at the HSCDC. Watkins asserts that he told Elkin about his medical conditions and his need for medication. Watkins indicated that he only saw Elkin for very brief periods of time. Watkins maintains that neither his blood sugar level or his blood pressure were ever checked. He testified that each time he saw Elkin he asked about the medication.

Additionally, Watkins pointed out that he submitted a number of grievances. The grievances were given to trustees who took them to Rowe. Watkins testified that the inmates are not provided with copies of the grievances.

As early as August 28th, Watkins was threatening to file a lawsuit. *Defts' Ex.* 3. Watkins testified he made the threat in hopes that someone would pay attention. Watkins had sued the HSCDC on two other occasions; one case was "thrown" out; and he settled the other. He filed this lawsuit on December 8, 2010, and was transferred to the ADC on January 18, 2011.

---

[1] Watkins maintains that he sent the original color photographs to the Clerk's Office, Hot Springs Division. The photographs can not be located.

### Dr. Carlos Rivas

Dr. Rivas testified he had treated Watkins in the past but could not recall if he prescribed Dilantin and Tegretol. In January of 2007, he ordered refills of certain medication when Watkins presented with a history of epilepsy and diabetes. On January 25, 2007, Dr. Rivas' assessment of Watkins was that he had epilepsy, diabetes, and high blood pressure. *Plff's Ex.* B-2. Dr. Rivas indicated this conclusion was based on his assessment, the verbal history provided, and the medications Watkins was taking. Dr. Rivas testified that Watkins needed medication to control these conditions or the conditions could worsen. February 21, 2007, was the last time Dr. Rivas had treated the Plaintiff.

According to Dr. Rivas, when medication is cut off abruptly, with a patient with a history of epilepsy, it can cause seizures. Dr. Rivas also testified that every seizure could be life threatening.

Dr. Rivas testified that when an inmate is booked in and indicates he has a medical problem for which he takes medication, the jail personnel can find out what medication the inmate is on and obtain a refill. However, this can only be done if the patient signs a release.

### Former Sheriff Ryan Burris

Burris testified that he had known Watkins for a number of years. Burris stated that he recalled that Watkins had been incarcerated several times. One time, Burris testified he authorized Watkins' release because of his medical conditions. Burris had been told that Watkins' medication costs were about $1,000 a month.

Burris testified that they had a verbal policy regarding pre-existing conditions. If there was a pre-existing condition, it was up to the inmate or his family to obtain the necessary medication. Rowe's responses to Watkins' requests followed this procedure. Burris testified it was up to the inmate to obtain his medication.

If an inmate had a heart attack or seizure, Burris testified Pro-Med was called to check the inmate. Burris recalled they had an inmate escape after faking a seizure.

At that time, Burris stated his medical budget was $10,000. Burris knew that some of the medication Watkins was taking was seizure medication. This was part of the reason Burris released Watkins on a signature bond on one occasion. When he was arrested in August of 2010, there was a mandatory appearance so Watkins could not be released. When Burris found out that the seizure disorder was pre-existing, he testified it was up to Watkins or his family to pay for the medication. Burris could not recall what they did if an inmate couldn't afford to pay for his medication. Burris testified that if an inmate became sick or injured the jail paid for his medical treatment.

Burris indicated they started using the inmate medical insurance form because it made the inmate acknowledge his responsibility and seemed to take the liability away from the county. *Plff's Ex.* W. They were looking for ways to get out of having to pay for pre-existing conditions. Burris testified that incoming inmates may not have been on their prescriptions medication for months but as soon as they became incarcerated they wanted their medication.

### **Chief Deputy Richard Tolleson**

Tolleson testified he had been employed at the HSCDC since May of 2009. He was a jailer at all times relevant to this case. When asked about jail policy with regard to pre-existing conditions, he testified that the policy had always been that the facility would not pay for a pre-existing condition. Tolleson did not believe that the detention center handbook contained anything on the distribution of medication. *Plff's Ex.* Y. He indicated that the handbook is being updated and revised. In March of 2010, Tolleson testified they moved to a new fifty man facility.

Tolleson testified that he knew Watkins and could recall the incarceration at issue in this case. Tolleson could not recall finding any of Watkins' seizure medication "in back."

Tolleson remembered Watkins being released in January of 2010 because of his medical conditions. Tolleson testified that he advised Sheriff Burris that Watkins' medication would probably cost $1000. Tolleson also advised Burris that Watkins' medication was for pre-existing conditions. As there was no bond on the charge, Tolleson testified that the Sheriff could not release Watkins on an own recognizance bond.

In August of 2010, there was a bond on the charge. The judge was asked to reconsider the bond and release Watkins but he refused. During this incarceration, Tolleson testified that Watkins could not produce any records showing he was still on the medication.

With respect to pre-existing conditions, Tolleson stated the County had to pay for necessary medication but hoped they could get reimbursed from the inmate. He stated the County could not refuse inmates necessary medication.

Tolleson recalled Watkins' Mother bringing in a "wad" of medication bottles. Tolleson testified he may have called Young's Pharmacy and asked them about the medication.

**Marcus L. Hawkins**

Hawkins was incarcerated at the HSCDC in August of 2010. He was housed with Watkins the entire time Watkins was in the HSCDC.

Hawkins testified that he witnessed Watkins have several seizures. Hawkins also recalled Watkins falling a couple of times. One of the falls occurred as Watkins was attempting to get down from his bunk. Watkins passed out and was laying on the floor shaking. There was blood from his head and lip. The episode lasted five minutes or so. Hawkins offered Watkins the bottom bunk.

Hawkins testified he saw Watkins trying to get his medication and saying that he was having seizures. Watkins talked to Rowe and tried to get sent to the hospital.

Hawkins testified that Watkins was not provided his medication. Hawkins stated there was

another inmate who had seizures and Rowe said the inmate was faking it part of the time. Hawkins testified that he had a seizure while at the HSCDC and was taken to the hospital. He indicated he no longer took Dilantin because he had not been experiencing seizures.

According to Hawkins, the intercom did not work. Hawkins could not recall seeing the guards making rounds. With respect to grievances, Hawkins testified that you completed a grievance form, gave it to a 309[2] inmate and they would give it to an officer. Copies were received when the response was given.

### Rodney Compton

Compton was incarcerated at the HSCDC with Watkins the entire time he was in the facility. He witnessed Watkins have three or four seizures. Compton recalled one occasion when he saw Watkins shaking and he stumbled and hit his head. Compton believed Watkins was either sitting or standing when he had this seizure. Watkins was bleeding from the head and mouth. Compton estimated that the seizure lasted for thirty-five to forty minutes.

Compton could not recall when this seizure happened. Compton reported the seizure to a guard and he acted like he didn't believe Watkins had a seizure. Compton testified that the jailers did not make routine checks.

### Linda Rowe

While the booking sheet for January 17, 2010, indicates Rowe was the booking officer, she testified she was not and did not work that shift. *Plff's Ex*. I-E. According to Rowe, this particular booking computer only took her name and that of one other officer. As a result, the actual booking officer used her name to access the booking procedure. Within about thirty minutes of intake, she

---

[2] Act 309 of 1983 as amended is an inmate program operated by the Arkansas Department of Correction. The Director of the Department of Correction signs cooperative agreements with county and city officials for the purpose of providing additional space for the care and custody of State inmates on a temporary basis in detention facilities operated by counties and cities. The inmates may be used to work in and around governmental property/projects while under supervision of the sheriff or chief of police or designee.

stated the Sheriff and Chief Deputy figured out what Watkins' medications would cost.

When he was booked in on August 24th, Rowe testified Watkins reported having various medical conditions. However, she stated she never knew he had seizures and had "no clue" that he was on seizure medication. According to Rowe, usually a person who has seizures carries medication with them. When medication is distributed, Rowe indicated she sits in the tower and can see the whole jail.

According to Rowe, grievances are delivered to her by either the 309's or by officers. She testified that she signs and dates every grievance she receives. A copy of the grievance goes in the inmate file and a copy is returned to the inmate.

Rowe testified she signed a medical request dated November 1, 2010, in which Watkins asked about sinus medication and his seizure medication that was prescribed by the doctor "last Friday.[3]" *Plff's Ex.* C-10. Her response was "[g]ot them." *Id.* Rowe testified that this meant the prescriptions had been obtained and taken to the control tower. However, Rowe stated she did not know what medications were obtained.

In general, when a prescription is written, a deputy sends it to the pharmacy and picks it up later in the day. The medication comes in sealed sacks and are taken to the tower.

With respect to Watkins' medications, Rowe testified she contacted every medical care provider mentioned by Watkins but no one had any record that wasn't over a year old. She did contact the Hot Spring County Medical Center but she was never provided with any information about his medications. Watkins did have a statement from the hospital covering the dates of 11-8-2009 to 11-13-09. Rowe testified she called the emergency room and was told there was no record of treatment for Watkins. Elkin contacted the medical center itself.

---

[3]The date of the doctor visit was October 29, 2010.

She stated that she even contacted Watkins' Mother. Rowe indicated the Mother brought in empty bottles and old prescriptions. Rowe testified she simply could not verify that Watkins was currently taking the medications. Further, she stated that she "broke" the rules by trying to help him. Since the conditions were pre-existing, Rowe testified it was the responsibility of Watkins or his family to obtain the medication.

She was aware that on prior incarcerations he was taking several medications. While she could have looked in his jail files to see what medications he was provided when incarcerated on prior occasions, she did not do so.

Rowe acknowledged that she had received the list of medications from the ADC. *Plff's Ex.* R. She testified this provided verification that Watkins had been on the medications he was requesting. With respect to the list of medications from Dr. Purifoy, *Plff's Ex.* A, Rowe testified she had never seen this document until after the lawsuit was filed.

Rowe testified that she had never seen Watkins have a seizure and that she needed a medical reason before she would send an inmate to the emergency room. With respect to the grievance dated September 11, 2010, *Plff's Ex.* 7, that mentions seizures, she testified she had never seen this grievance until the week before the hearing when she was shown it by her attorney.

Rowe testified that Elkin provided medical care to the inmates. Inmates requested medical treatment by checking medical on a form that could be used to make general requests, medical requests, and grievances. *See e.g, Plff's Ex.* C-1. If it was a medical request, it was placed in a box for Elkin. He came in at least once a week. If the medical request was for something simple like a headache, detention personnel could handle it. If the request involved something more serious, it went to Elkin. Rowe testified that jail personnel cannot make medical decisions. Rowe believed that Watkins was seen nearly every time Elkin came to the jail.

**Darrell Elkin**

Elkin testified he is a Nurse Practitioner who contracted with the jail to be a medical care provider. A Nurse Practitioner has the ability to write prescriptions but must be supervised by a physician.

During Watkins' incarceration, Elkin indicated he saw Watkins about sixteen times. Watkins made Elkin aware that he had seizures and needed seizure medication. If Elkin could have verified that there was a current prescription for these medications, Elkin testified he would have obtained the medication for Watkins. Elkin stated that he was not involved in medication distribution and does not have anything to do with completing the inmate medication ledgers.

On August 24th, Elkin testified that Watkins gave him a list of medications. Elkin wrote them down. When Watkins was asked where he was having his medication filled, Elkin states Watkins eventually listed the following pharmacies: Wal-Mart Pharmacy; USA; Walgreens; and Freds. Elkin testified he checked with each of the listed pharmacies and none had a current record for the medications. With respect to the medical records of Rivas and Purifoy, Elkin testified that neither had ordered blood tests to monitor the level of the seizure medications. Elkin indicated he called the labs to see if blood had been drawn every three months on Watkins to check the level of Dilantin or Tegretol. Elkin did not call the ADC and conceded that he did not know what tests were done.

With respect to the Malvern Hospital, Elkin testified he checked with the psychiatric unit and Watkins had not been there. Elkin stated that Watkins had been to the emergency room. *See e.g., Plff's Ex.* F.

With respect to Purifoy, Elkin states he could have called him but the prescriptions given would have only been for a couple of weeks and then Watkins was supposed to follow-up with his

primary care physician. *Plff's Ex.* A. Elkin conceded that there was a prescription out there.

Elkin testified that he had received the list of medications from the ADC. However, the records were nine months old. If Watkins had gone without the seizure medication for six months, it would not have shown up in a blood test. According to Elkin, he never ordered seizure medication for Watkins because he could not verify that Watkins had a current prescription for the medications. In Elkin's opinion, it would be unethical and harmful to give Watkins the medication if he had been weaned off the medication or had stopped taking it.

On September 9th, Elkin took Watkins' blood pressure and tested his blood sugar level. *Defts' Ex.* 7. Both were good. *Id.*

Elkin testified that he checked Watkins blood sugar level eight or nine times during the relevant time frame. Elkin testified he did not document these tests because the readings were within the normal range. If the tests had shown either that Watkins had diabetes or was hypoglycemic, Elkin testified that he would have treated Watkins.

Elkin testified that seizures could constitution a serious medical condition. He was unaware of the fact that Watkins had been in the jail before. Elkin stated he did not know Watkins had previously filed lawsuit against individuals employed by the HSCDC. Elkin stated he did not start contracting with the HSCDC until the new jail opened.

Elkin indicated that the number one side effect of not taking seizure medication is a seizure. Seizures can be life threatening. Additionally, Elkin testified that going off the medication could have serious side effects and could even be life threatening.

Elkin testified he was aware of the jail's policy of not filling medication for pre-existing conditions. However, he had the authority to override the policy. If an inmate needs his medication, Elkin would inform the Sheriff and the medication would be obtained.

According to Elkin, Watkins never reported that he was seizures in the jail. Elkin testified that he did not know that Watkins even had a seizure discover. However, if it had been reported to him that Watkins was having seizures in the jail, Elkin testified he would have sent Watkins to the emergency room.

Watkins had chronic conjunctivitis in both eyes and Elkin prescribed various medications for this condition as well as medications for sinusitis. These prescriptions were paid for by the jail. Elkin asserts that Watkins did not request seizure medication during any of their visits. With respect to the jail forms, Elkin testified those "strictly" marked medication were given to him. Elkin wrote on the request what action he was going to take.

As mentioned above, the Court received the records kept by Elkin in connection with his visits with Watkins. *See Court Ex.* 2. These records include: (1) a medical request from Watkins dated August 24th in which he states he was a number of medical conditions including diabetes, seizures and high blood pressure; (2) a form dated September 3rd which states "await meds from Malvern hospital;" (3) a form dated September 7th that contains Watkins blood pressure reading and his blood sugar level: (4) a medical request from Watkins dated September 11th in which he states he has not yet received his medication--Ibuprofen was prescribed; (5) a request dated September 18th on which Watkins stated he had a bad cold and needed his medication for pain, seizures, and high blood pressure--response "refused to be seen;" (6) a form dated October 27th regarding sinus problems and stating he had not received his other medications that the doctor ordered; (7) a form dated November 5th stating he still had a bad cold; (8) a request dated November 14th to see the doctor about a bad head cold and was having problems with his eyes; (9) a request dated November 20th complaining of a bad head cold and an infection in his eyes; (10) a request dated November 28th about the eye infection and the medication not working; (11) a request dated December 9th

regarding Watkins' head cold and two types of medication that did not work; (12) a request dated December 16th for a refill of eye drops; (13) a request dated December 22nd complaining of the problems with his eyes and lower back pain; (14) a request dated January 5th about his eye infection; (15) a request dated January 13th asking to go to the emergency room because his vision was blurry and his eyes swollen--mentions diabetes and how it could affect his eyes; and (16) a health services request form dated January 14th asking for Watkins to be transferred to the ADC due to chronic conjunctivitis. *Id.*

The ADC records indicate that during a September 2007 incarceration Watkins was noted to have hypertension, diabetes, and a seizure disorder. *Court's Exhibit* 4.[4] He was prescribed medication for each of these conditions and put on a therapeutic diet. *Id.* Records from 2009, 2011-13, indicate Watkins was prescribed medication for each of these conditions. *Id.*

### 2. Discussion

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more

---

[4]These records are not numbered. However, the lower right hand corner of many of the records contains a date.

even that gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

The evidence established that Watkins had a history of having a seizure disorder, high blood pressure, and diabetes. It was undisputed that Watkins had been on seizure medication while incarcerated in the ADC and while hospitalized in November of 2009. Additionally, records from the Federal Correctional Institute in Forrest City, Arkansas, state that Watkins was unable to work due to "severe Epilepsy and Seizure disorder. Patient also suffers from severe lower back spasms, HTN, Diabetes, R. knee arthritis." *Plff's Ex.* D. Dr. Prince, the examining physician noted that Watkins had been under his care since 2001. *Id.* The medication he was on is the same medication he requested while incarcerated at the HSCDC.

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). In Dulany v. Carnahan, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

Dulany, 132 F.3d at 1239. See also Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001).

Defendants relied on the fact that Watkins' conditions were pre-existing. No effort was made to medically evaluate him. Instead, Defendants efforts were focused on requiring Watkins to prove that he had current prescriptions for the medications. When Watkins was unable to establish that, he was denied his medications. This is true despite the fact that available medical records indicated he had the claimed medical conditions and had been on medications for the same at various times. The clearly established law is that:

> If a prisoner is able to pay for medical care, requiring such payment is not deliberate indifference to serious medical needs. *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1973). Instead, such a requirement simply represents an insistence that the prisoner bear a personal expense that he or she can meet and would be required to meet in the outside world. *See, e.g., Shapley v. Nevada Bd. of State Prison Commissioners,* 766 F.2d 404, 408 (9th Cir.1985) (nothing per se unconstitutional about charging an inmate $3 for every medical visit; such a charge, by itself, did not constitute deliberate indifference under *Estelle* ). However, a prison official who withholds necessary medical care, for want of payment, from an inmate who could not pay would violate the inmate's constitutional rights if the inmate's medical needs were serious, because refusal to act pending the impossible is no different from refusing without qualification.

Moralis v. Flageole 2007 WL 2893652, 18 (C.D. Ill. 2007).

Obviously, a decision made on the basis of whether a condition pre-existed the Plaintiff's incarceration is not based on medical judgment. Cf., Rand v. Simonds, 422 F. Supp. 2d 318 (D.N.H. 2006)(question of fact as to whether supervisors acted with the requisite degree of deliberate indifference when they relied on the fact that the plaintiff's injury was a pre-existing condition and as a result facility would not provide treatment unless plaintiff would pay for it–however, summary judgment granted supervisors because the injury did not amount to a serious medical need as a matter of law).

In this case, Elkin testified that he kept no other records except a few handwritten notations

on the medical requests. Although Elkin testified he saw Watkins sixteen times, his notations do not indicate whether he personally saw Watkins on each occasion or merely made notations in response to the medical request. Despite Elkin's testimony that he checked Watkins' blood pressure and blood sugar level on numerous occasions, his records do not reflect that. Instead, Elkin's records contain only one blood sugar level on September 7th and only two blood pressure readings, September 7th and October 27th.

Although both Elkin and Rowe testified that they attempted to verify that Watkins had been on the medications immediately prior to his incarceration, no efforts were made to determine if Watkins had a seizure disorder, high blood pressure, or diabetes. Instead, they focused their efforts entirely on whether he had a current prescription. The records clearly establish that Watkins had been diagnosed with these serious, and potential life threatening, medical conditions. I believe their failure amounts to deliberate indifference to Watkins serious medical needs.

I turn to the issue of what damages should be awarded. Compensatory damages under § 1983 are governed by general tort-law compensation theory. See Carey v. Piphus, 435 U.S. 247, 255 (1978). In *Carey*, the Supreme Court noted that damages are available under § 1983 for actions "found . . . to have been violative of . . . constitutional rights and to have caused compensable injury." *Id.* (internal quotation marks and citations omitted). The law generally provides that damages may be awarded for injuries such as mental anguish and suffering, personal humiliation, and monetary losses. Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307 (1986)(citations omitted). However, damages may not be awarded for the abstract or subjective value of the constitutional right at issue. See Stachura, 477 U.S. at 308; *Carey*, 435 U.S. at 248.

In this case, Watkins asks for damages for seizures he suffered as a result of not receiving

his medications and his physical pain and mental anguish he suffered because he did not have his medications while in the HSCDC. These types of damages are not subject to accurate measurement. Hendrickson v. Cooper, 589 F.3d 887, 892 (7th Cir. 2009). The award of damages in cases in which is has been found that defendants exhibited deliberate indifference to the serious medical needs of the plaintiff vary greatly. See e.g., Coleman v. Rahija, 114 F.3d 778 (8th Cir. 1997)($1,000 compensatory damage award for two hours of pain and suffering caused by delay in taking the plaintiff who was in labor to the hospital); Warren v. Fanning, 950 F.2d 1370, 1374 (8th Cir. 1991)(No compensatory damages awarded despite delay of a year in referring plaintiff to an outside specialist for complaints of pain and infection of the toes of his left foot and pain in his right ankle).

We credit the testimony of Watkins, Hawkins and Compton that Watkins suffered a number of seizures as a result of the fact he did not have his medication. He fell once causing some minor scarring. There is no indication in the record that he suffered ill effects as a result of not having his diabetes or high blood pressure medication. Based on the evidence in the record, I believe an award of compensatory damages in the amount of $500 would be appropriate. Additionally, Defendants will be required to pay the filing fee.

### 3. Conclusion

For the reasons stated, judgment will be entered in favor of the Plaintiff.

DATED this 25th day of March 2013.

          /s/ *J. Marschewski*
       HON. JAMES R. MARSCHEWSKI
       CHIEF UNITED STATES MAGISTRATE JUDGE